THE BALTIMORE TRANSIT COMPANY, a Body
Corporate, et al.,

*vs.*

J. ROGERS SWINDELL,

*Negligence*: *collision of electric omnibus with gasoline tank
wagon; liability of the United Railways, the control-
ling corporation of the Omnibus Company.*

A trolley car of the United Railways collided with a 'bus of
the Baltimore Transit Company, causing the latter to collide
with an oil tank wagon; the gasoline from the tank wagon
escaped and burned the 'bus, injuring a number of passengers;
a prayer to the effect that if the jury should believe that the
Baltimore Transit Company was controlled in its operation by
the United Railways Company, then if the jury should find a
verdict against the Transit Company, they should also find
against the Railways Company, even though they find no negli-
gence in the operation of the trolley car, was: *Held,* to be cor-
rect.                                          p. 278

*Decided February 8th, 1918.*

Appeal from the Court of Common Pleas of Baltimore
(Soper, C. J.), where there was a judgment for the plain-
tiff for $20,000.00.

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BURKE, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Joseph C. France* (with whom was *J. Pembroke Thom* on the brief), for the appellant.

*Barton, Wilmer & Stewart, and Aubrey Pearre* filed a brief in behalf of Louis Blaustein, trading as the American Oil Company.

*James J. Lindsay,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

The suit in this case was instituted by the appellee against The United Railways and Electric Company, The Baltimore Transit Company and 'The American Oil Company, to recover for personal injuries sustained by the plaintiff while a passenger of The Baltimore Transit Company.

We will hereafter refer to the defendants as the Railways Company, the Bus Company and the Oil Company.

The trial of the case resulted in a verdict against the Railways and the Bus Company, and a verdict for the Oil Company. A judgment was entered against the Railways Company and the Bus Company, and it is from that judgment that this appeal is taken.

In the transcript of the record sent to this Court it erroneously appears from the caption to the bill of exceptions that the Oil Company is an appellee in this case. The judgment was against the Railways Company and the Bus Company in favor of the plaintiff, and, as disclosed by the record, the appeal was taken by said companies from the judgment so entered. The Oil Company is in no way a party to this appeal and it will not be considered by us as a party thereto.

The appellee about seven o'clock on the evening of January 6th, 1917, boarded a north-bound bus of the Bus Com-

pany, at the corner of Mulberry and Charles Streets. The bus stopped to exchange chauffeurs when it reached the company's garage on the east side of Charles Street about midway between Lanvale Street and Lafayette Avenue. There was at the time, near the east curb of Charles Street in front of the Auto Service Company's garage adjacent to and north of the Bus Company's garage, a tank wagon facing northward, delivering gasoline to the Auto Service Company. The gasoline was being drawn from the tank wagon, through a spigot, into five gallon cans, and then emptied in a funnel placed in an open pipe in the sidewalk that led to the gasoline tank of the Auto Service Company. Two cans were being used. When one was filled, it was taken from the spigot and an empty can was hung thereon and left there with the spigot partially turned. The full can was then carried a few feet away, and its contents emptied in the funnel. The can was then returned to the wagon, and when the one upon the spigot was full it was removed and the empty can took its place.

The relief chauffeur, after entering the bus and closing its door, took his seat upon the left side thereof, and headed his bus diagonally across the northbound track of the Railways Company to get around the tank wagon, which was fifteen or twenty feet in front of him. He was upon the track and was turning the front wheels of the bus up the track when it was suddenly struck upon the left side, near the rear, by a northbound car of the Railways Company.

The effect of the collision was to cause the hood of the bus to strike the side of the tank wagon near its rear, and, as one of the witnesses expressed it, "in the time it takes to count three" flames burst out around the hood and between it and the glass shield. Or, as another witness, who was a a passenger in the bus, testified, "immediately after the collision with the tank wagon there was a tremendous blaze in front of the machine, right outside of the hood, between it and the front glass of the bus. The flame was instantly of

large volume and went in the air probably five or six feet, and
so quickly that the people who had started toward the door
at the front of the bus to make their exit at that point could
not get out at that door. They then rushed toward the emer-
gency door at the rear of the bus, but were unable to get it
open, although they were assisted by persons on that street."
They were told to beat the door open; this they tried to do,
but failed in their efforts. At this time "the gasoline was
running down all over the car, and it was all ablaze all over
the right-hand side. The bus was like a furnace—it was abso-
lutely unbearable—and the gasoline was coming through the
floor."

The chauffeur immediately after the collision made his
escape through the front door of the bus, but, as we have
stated, the means of escape through that door was almost
instantly closed to the passengers because of the flames. The
plaintiff testified "that the machine was covered with fire
all around it, down the right side and the left side, and I
turned and looked to the rear, and I could see the men in
the rear of the machine fighting to get the rear door open,
but there was a seat across there; it was covered, and they
could not get it open." He finally got through one of the
windows, but in making his escape had to pass through the
flames upon the outside. He was badly burned, and was in
the hospital for nine weeks suffering great pain and discom-
fiture from his burns. The physician who attended him testi-
fied that he was permanently injured; that there was a "par-
tial destruction of the external ear," and an injury to the
nose; that the scars upon his face, neck and other parts of
his body were permanent; that his right forearm was much
smaller than his left as a result of the injury, although he
anticipated, or at least hoped for, a redevelopment of the
arm, but that he was permanently injured and disabled in
his right hand.

There are a number of exceptions to the evidence taken by
each of the appellants, and one jointly taken by them to the

ruling of the Court upon the prayers. The exception to the prayers includes the action of the Court upon the granted prayers of the Oil Company.

The plaintiff asked for one instruction, which was granted. The Railways Company offered fourteen prayers, all of which were rejected. The Bus Company offered eighteen; of these Nos. 1, 2, 3, 4, 4½, 5, 5½, 6, 7, 7½, 9, 10, 11, 12, 12½ and 13 were rejected, and Nos. 8 and 14 were granted as modified. The Oil Company's *ninth, eleventh* and twenty-seventh prayers were granted as submited, and its *eighth, twenty-seventh* and *thirty-first* and "A" prayer were granted as modified.

The Court by the Oil Company's "A" prayer directed the jury that if they should believe from the evidence "that the Baltimore Transit Company was controlled in its operations by the United Railways, that if the jury finds a verdict against the Baltimore Transit Company, they must also find against the United Railways, even though they find no negligence on the part of the motorman of the trolley car," etc. The Court having taken this view of the liability of the Railways Company, it rejected its prayers by which the plaintiff's right to recover against it depended upon the existence of negligence on the part of that company.

The evidence of Mr. Thom, we think, was legally sufficient to go to the jury as tending to show that the Bus Company was controlled in its operations by the Railways Company; but should it be otherwise regarded, the prayer for such reasons cannot be held bad, as there was no special exception taken to it.

The law, as stated in this prayer, is, in our opinion, in full accord with the rule of law laid down in *Foard* v. *State, of Maryland,* 219 Fed. 829, and the cases there cited. We, therefore find no error in the Court's ruling in granting the Oil Company's "A" prayer and in rejecting the prayers of the Railways Company.

The eighth prayer of the Oil Company correctly states the law with reference to its duty in the delivery of gasoline, and the law as to the burden of proof is properly stated by its ninth prayer; but the appellant can not complain of the granting of these prayers as they in no manner touch their liability, or in any way improperly affect them in making their defense to the action.

By the thirty-first prayer of the Oil Company the jury were told that there was no legally sufficient evidence to show the tail lamp on the tank wagon was lighted at the time of the accident and that they were to consider all the evidence in relation to the same merely as illustrating the inflammable character of the gasoline and gasoline vapor.

It is contended by the appellants that there was evidence legally sufficient to go to the jury as tending to show that the lamp upon the rear of the tank wagon was lighted at the time of the accident. This contention is not made upon the statement of any witness that he saw the lamp lighted at such time, but upon the presumption that Imhoff, the chauffeur upon the tank wagon, and the traffic officers of the City had done their duty. It being the duty of the chauffeur, under the Statute of the State (Act of 1916, Chapter 687, sec. 148), to light the lamps of his tank wagon one-half hour after sunset; and the duty of the traffic officers to enforce that law.

Imhoff, the chauffeur of the tank wagon, testified that he left South Baltimore with a full load of 1,500 gallons of gasoline; that he made several stops, just where he could not at the time recall, before he reached the Auto Service Station where the accident occurred. Before going to the last named place he went to the Imperial Garage which adjoins the Auto Service Station. They told him at that place that they did not want any gasoline. He then called Mr. Blaustein, of the Oil Company, over the phone, but the lines were busy and he could not get him. After waiting, however, about one half-hour he called him again and finally got him

and was told by him to call at the Auto Service Company's station. He made inquiry at that place and learned that they wanted gasoline, but he had to wait fifteen or twenty minutes for some one to "check" the quantity as it was delivered to the company. Mr. Stevens finally came out and the witness proceeded to deliver the gasoline.

Upon cross-examination the witness testified that he left Hanover street at about three o'clock in the afternoon, stopped at a number of places, did not then recall just where he stopped, or when he arrived at or near the scene of the accident, "but it was just before dark." At that season of the year he supposed it was dark about half-past five or quarter of six o'clock; that "about half-past six or twenty minutes of seven, somewhere along there," he commenced delivering the gasoline to the Auto Service Company, and "the accident occurred about quarter of seven" o'clock. He stated that he did not want to light the lamp until he had finished delivering gasoline; that Mr. Blaustein had directed him not to have the rear lamp burning at such times.

It is true that he, in answer to a question upon cross-examination, said: "Well, the fire occurred, then, you know, and I just lit my rear lamp when I drove down to the place, you know. The back lamp was burned; I could not light that; that was out, you know, before the fire started, but it was burned, I could not light it afterwards. The glass was busted out of it and it was damaged."

The answer clearly shows the confusion of the witness, and it is hard to ascertain just what he meant by it, but the confusion as to its meaning is cleared away by his answer to the following question asked by the counsel for the Bus Company: "Have you any independent recollection as to whether or not on this night you actually lighted that lamp, or did not light the lamp, or as to whether you put it out or did not put it out, or are you testifying as to what you would do in accordance with Mr. Blaustein's orders?" He answered: "I

did not have it lit at that time. I did not light it at all that night."

The presumption contended for by the appellants in this case that the lamp upon the rear of the tank wagon was lighted at the time of the accident, arising from the further presumption that the chauffeur and the traffic officers of the City faithfully executed the duties with which they were charged on that occasion, is a mere arbitrary rule of law, and it being unsupported by any evidence that said lamp was at that time lighted, and opposed by the positive evidence of the chauffeur that it was not lighted at any time on the evening of the accident, it was the duty of the Court below to hold as a matter of law that such presumption was without probative force and to refuse to submit it to the jury as tending to show that said lamp was lighted at such time,—*Spaulding* v. *The Chicago & N. W. R. W. Co.,* 33 Wis. 582; 9 *Enc. of Evidence,* 885 and 886, and cases cited in notes thereto.

We find nothing in the instructions of the Court, contained in the Oil Company's 11th and 27th prayers of which the appellants can rightfully complain. The law, we think, is correctly stated.

The plaintiff's prayer which is the usual damage prayer in cases of this character, properly states the law as to damages.

We also find no error in the Court's refusal to grant the Bus Company's first prayer.

The Bus Company's 2nd, 4th, 4½, 5th, 5½ and 6th prayers were all properly refused, as there was no legally sufficient evidence of a lighted lamp upon the rear of the wagon at the time of the accident.

We discover no error in the rulings of the Court in refusing the Bus Company's 7th, 7½ and 13th prayers, and what we have said in discussing the Oil Company's 31st prayer as to the legal presumption that the lamp upon the rear of the tank wagon was lighted on the evening of the accident, applies to the 9th, 10th, 11th, 12th and 12½ prayers of

the Bus Company, nor do we find any error in the Court's action in granting the 8th and 14th prayers as modified.

There was no error in the Court's rulings on the Railways Company's 1st exception, nor was there any error in the Court's ruling on its 2nd exception, for the reasons stated in sustaining the rulings of the Court in refusing the Bus Company's 2nd, 4th, 4½, 5th, 5½ and 6th prayers. Its 3rd exception was to the refusal of the Court to admit in evidence an ordinance of the City regulating the storage and transmission of gasoline in garages, gasoline stations, etc., in the City of Baltimore. After a careful reading of the ordinance we discover no error in the Court's ruling upon this exception. Its 4th, 5th and 6th exceptions were not pressed, but the Court we think ruled properly thereon. The Court's rulings upon its 7th, 8th, 9th and 10th exceptions were correct in view of what we have said as to the action of the Court in granting the Oil Company's A prayer.

The Bus Company's 1st, 2nd and 7th prayers are not pressed, and we find no error in the Court's rulings upon the same.

Its 3rd, 4th, 5th and 6th exceptions are to the refusal of the Court to permit certain hypothetical questions to be answered. The Court's action thereon we think was correct. One of the objections thereto being that the questions contain facts or inferences that should not have been embraced therein.

As we find no error in the rulings of the Court we will affirm the judgment of the Court below.

*Judgment affirmed, with costs to the appellee.*